FIRST CONSTRUCTION COMPANY OF BROOKLYN, Respondent and Appellant, *v.* THE STATE OF NEW YORK, Appellant and Respondent.

Eminent domain — constitutional law — when act granting lands under water to upland owners invalid because lacking a two-thirds vote — act attempting to ratify and confirm such grants invalid because embracing subjects not expressed in title — when act granting right to fill in lands under water gives an inchoate and vested right of which grantee cannot be deprived without compensation — when part of act giving such rights is valid under Constitution so that part may be upheld although the remainder be rejected as invalid — awards to such upland owners examined and held to be incorrect — basis of award pointed out.

1. A legislative grant without a valuable consideration to an upland owner bordering on public tidewater to fill in and erect docks on lands lying under water in front of him does not convey title in fee to said latter lands. It does, however, give more than a mere license revocable at will. It conveys a vested, inchoate right in the lands to be filled in, which is in the nature of a franchise. If the upland owner exercises his right and fills in the land in question he thereby acquires title to the same as a necessary incident to the enjoyment of the grant. On the other hand, if he fails within a reasonable time or within the time specified to exercise his right the same may be forfeited for non-user.

2. An act attempting to grant such a right or franchise comes within the provision of the Constitution requiring a two-thirds vote.

3. Where prior to 1884 acts had been passed by less than a two-thirds vote granting to an upland owner, without valuable consideration, the right to fill in and erect docks on lands in front of his

premises, and in the latter year an act was passed by the necessary two-thirds vote which by its title indicated a purpose to confirm the grants attempted to be made by the prior acts, but which in its body not only attempted to confirm the right or franchise granted by said prior acts to fill in and thereby acquire title, but also attempted to convey title in fee to a large portion of the lands in question which had never been filled in, such act violated the provision of the Constitution, which says: "No private or local bill which may be passed by the legislature shall embrace more than one subject and that shall be expressed in the title." The purposes attempted by said latter act, however, are so distinct and separable that the act may be upheld in respect of the provisions indicated by the title confirming the grant of the franchise made by prior acts and thereby eliminating the defect arising from the lack of a two-thirds vote, although it be deemed and held unconstitutional so far as concerns the other purpose to convey the title in fee to lands in respect of which the franchise had not been exercised.

4. In proceedings to acquire compensation for lands appropriated by the state for barge canal purposes, a certain sum per square foot for land lying under water based upon the theory that the claimant is the owner in fee of the premises in question is not the proper measure of the value of a franchise to fill in said lands and thereby acquire title in fee. The value of the land before filling would not necessarily be the same as the value of the land after it had been filled in less the cost of such filling; the cost of the latter might be more or less than the increase in value of the land by reason of such filling in. Moreover, various considerations might be taken into account in fixing the value of a franchise which might not find any place in an estimate of the value of land whereof the claimant held the title in fee.

5. In such proceedings as above, the state may offer as a defense to a demand for damages because of the appropriation by it of land, the claim that the acts under which the claimant asserts its rights are unconstitutional and invalid.

6. By various acts prior to 1884, which lacked the necessary two-thirds votes, the right was in terms granted to plaintiff's predecessor and assignor, who was an upland owner bordering on Gowanus bay, Long Island, to fill in and erect docks upon land under water lying in front of his premises. Only a small portion of the land described was ever filled in. In 1884 an act was passed by the necessary two-thirds vote, which in substance was entitled one to confirm said prior grants. In its body it attempted not only to confirm said prior acts and eliminate the defect arising from

lack of necessary votes but also to give title in fee to a large portion of the lands in question which had never been filled in and to which, therefore, claimant's predecessor had never acquired any title independent of the lack of necessary votes. Subsequently these lands were appropriated by the state for Barge canal purposes, and a claim was filed by claimant for damages on account of such appropriation amounting to upwards of three millions of dollars. It was held that a grantee acquired title to lands which were filled in under such grants as were made to claimant's predecessor, and also that the act of 1884 cured the defect arising from lack of a two-thirds vote on the passage of the prior acts, and conveyed title to all of the lands in question whether filled in or not, and an award was made at a certain price per square foot on the theory that the claimant by virtue of the confirmatory act of 1884 had become the owner in fee of all the lands described in the original grants, whether filled in or not. *Held,* error; that the prior acts were defective because not passed by a two-thirds vote, and the confirmatory act of 1884 was unconstitutional and ineffective to grant title to lands which had not been filled in, because such purpose was not disclosed in the title of the act, although said act might be held valid and constitutional so far as it confirmed the grant under the earlier acts of a right to fill in and thereby acquire title, and which purpose was disclosed in the title; that this right was a mere franchise and its value was not properly fixed by an award which gave to the claimant damages at so much per square foot on the theory that it was the owner in fee of the lands, instead of the owner of a franchise to fill in said lands and thereby acquire title; that the test of a price per square foot on the theory of ownership in fee was not the proper one by which to measure the value of claimant's franchise, as different considerations might govern in the latter case than in the former one.

7. Various acts of the legislature, including the one of 1884 above referred to, considered and *held,* that it was not the intent of the legislature by the acts granting to claimant's predecessor and assignor the right to fill in the lands in question, to extend said right over the space included within the lines of certain streets opened and established by legislative acts through the area in question, although said streets had never been physically opened or used at the time the act of 1884 was passed.

*First Construction Co.* v. *State of New York,* 174 App. Div. 560, modified.

(Argued May 30, 1916; re-argued March 8, 1917; decided July 11, 1917.)

Cross-appeals from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered February 2, 1916, unanimously affirming an award of the Board of Claims.

Because of the retirement before decision of two members of the court who heard the original argument, a re-argument of the appeal was had.

The facts, so far as material, are stated in the opinion.

*Egburt E. Woodbury*, Attorney-General (*Joseph A. Kellogg*, *Arnold J. Potter* and *Sanford W. Smith* of counsel), for State of New York, appellant and respondent. The several acts under which the claimants assert title do not grant or confer any ownership or interest in the lands under water appropriated, but were enacted only as the exercise of the state's control of the tideway for the purpose of regulating commerce. If they could be construed as conveying title, they would be unconstitutional. (*Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Thousand Island Steamboat Co.* v. *Visger*, 179 N. Y. 206; *Town of Brookhaven* v. *Smith*, 188 N. Y. 74; *People* v. *Mould*, 37 App. Div. 35; *Prosser* v. *N. P. R. R. Co.*, 152 U. S. 59; *Wetmore* v. *B. G. L. Co.*, 42 N. Y. 384; *Wetmore* v. *A. W. L. Co.*, 37 Barb. 70; *Huber* v. *People*, 49 N. Y. 132; *People* v. *Supervisors*, 43 N. Y. 10; *People ex rel. Purdy* v. *Comrs. of Highways*, 54 N. Y. 276; *Astor* v. *Arcade R. Co.*, 113 N. Y. 93.) Tidal lands and the control of the waters above them are vested in the state as sovereign in trust for the purposes of commerce and navigation, and all grants of such lands are held subject to the paramount rights of the state which cannot be alienated. The state may re-enter upon such lands for the purposes of commerce or navigation without making compensation to the grantee thereof. The liability of the sovereign in any event in such a case is limited to such liability as it voluntarily assumes. (*Coxe* v. *State*, 144 N. Y. 396; *People* v. *Vanderbilt*, 26

N. Y. 287; *People* v. *N. Y. & S. I. F. Co.*, 68 N. Y. 71; *Mayor, etc.,* v. *Hart*, 95 N. Y. 443; *Dermott* v. *State*, 99 N. Y. 101; *Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Sage* v. *Mayor*, 154 N. Y. 61; *Matter of City of New York*, 168 N. Y. 134; *White* v. *Nassau Trust Co.*, 168 N. Y. 149; *Slingerland* v. *International Contracting Co.*, 169 N. Y. 60; *Town of Brookhaven* v. *Smith*, 188 N. Y. 74; *Lewis Blue Point Oyster C. Co.* v. *Briggs*, 198 N. Y. 287; *Fulton H., L. & P. Co.* v. *State*, 200 N. Y. 400; *Lehigh Valley R. R. Co.* v. *Canal Board*, 204 N. Y. 471; *De Lancey* v. *Hawkins*, 23 App. Div. 8; *People* v. *Mould*, 37 App. Div. 35.) The entire area included within the street lines within the appropriation, by numerous statutes and proceedings, has been devoted to the public use and burdened with easement access. The fee of these streets is outstanding in the state, the street easement is vested in the city of New York, and no repeal of this public use can be presumed. (*Matter of City of Brooklyn*, 73 N. Y. 179; *Matter of Wells Ave.*, 22 N. Y. S. R. 648; *K. Ice Co.* v. *F. S. R. R. Co.*, 176 N. Y. 408; *Am. Ice Co.* v. *City of New York*, 217 N. Y. 402; *Robins D. D. & R. Co.* v. *City of New York*, 155 App. Div. 258; 213 N. Y. 631.) No grant "in pursuance of section 3 of chapter 702 of the Laws of 1873," ratified and confirmed by chapter 491 of the Laws of 1884, was obtained by the claimant or its predecessors in title because they failed to appropriate the lands under water to the uses of commerce as required by law and the preceding acts. (1 Farnam on Water & Water Rights, 223, 224; Gould on Waters [3d ed.], 274, 275; *Engs* v. *Peckham*, 11 R. I. 210; *Aborn* v. *Smith*, 12 R. I. 370; *B. & H. Steamboat Co.* v. *Munson*, 117 Mass. 34; *Polhemus* v. *Bateman*, 60 N. J. L. 163; *M. C. E. Co.* v. *C. R. R. Co.*, 16 N. J. Eq. 419.)

*William N. Dykman* for claimant, respondent and appellant. The legislature granted the lands under

water within the appropriated area to the upland owner in fee. (L. 1873, ch. 702; L. 1875, ch. 398; L. 1884, ch. 391; *Wetmore* v. *A. & C. Co.,* 37 Barb. 70; 42 N. Y. 384; *Muhlker* v. *N. Y. & H. R. R. Co.,* 197 U. S. 544; *People ex rel. Cook* v. *Wood,* 71 N. Y. 371; *People ex rel. Corscadden* v. *Howe,* 177 N. Y. 499.) The Barge Canal Terminal Act provides that riparian owners shall be paid for land under water to bulkhead line. (L. 1911, ch. 746; *L. V. R. Co.* v. *Canal Board,* 204 N. Y. 471.) The award should be affirmed though the court conclude that the fee of the lands is in the state. (*Rosch* v. *N., etc., R. Co.,* 198 N. Y. 385; *Williams* v. *Mayor,* 105 N. Y. 419; *Bell* v. *City of New York,* 77 App. Div. 437; *Bedlow* v. *Stillwell,* 158 N. Y. 292; *Matter of City of New York,* 117 N. Y. 553.) The referee and the Board of Claims erred in excluding lands within the lines of so-called streets. (*Robins, etc., Co.* v. *City of New York,* 155 App. Div. 258; 213 N. Y. 631; *Raynor* v. *Syracuse University,* 35 Misc. Rep. 83; *Woodruff* v. *Paddock,* 56 Hun, 288; 130 N. Y. 618; *Ludlow* v. *Oswego,* 25 Hun, 260; *Buffalo* v. *Hoffeld,* 6 Misc. Rep. 197; *People ex rel. Yonkers* v. *N. Y. C. & H. R. R. R. Co.,* 69 Hun, 166.) The act of 1873 grants the lands under water to the upland owners. (*Wetmore* v. *A. W. L. Co.,* 37 Barb. 70; 42 N. Y. 384; *People* v. *Vanderbilt,* 26 N. Y. 287; *Ferguson* v. *Ross,* 126 N. Y. 459; *Towle* v. *Remsen,* 70 N. Y. 303; *Stuart* v. *Laird,* 1 Cranch [U. S.], 299; *Opinion of the Justices,* 3 Pick. 517; *Atty.-Gen.* v. *Bank, etc.,* 5 Ired. 71; *Kenison* v. *Hill,* 1 La. 469; *Packard* v. *Rutland,* 17 Mass. 132; *Morrison* v. *Barksdale,* Harp. 101; *Troup* v. *Haight,* Hopk. 268; *Jackson* v. *Gumeer,* 2 Cow. 567; *Smith* v. *Jersey,* 2 Brod. & Bing. 506.) The act of 1884 is valid, so far as it ratifies and confirms Mr. Beard's title to the lands under water granted or attempted to be granted by the act of 1873. (*People ex rel. Rochester* v. *Briggs,* 50 N. Y. 553; *Matter of N. Y. & L. I. Bridge,* 148 N. Y.

540; *Bohmer* v. *Haffen*, 161 N. Y. 390; *Matter of Sackett, etc., Street*, 74 N. Y. 95.) The grants to the board were not revocable. (*Matter of L. S., etc., Co.*, 212 N. Y. 1; *N. Y. El. L. Co.* v. *E. L. Subway Co.*, 201 N. Y. 321; 235 U. S. 179.) The grants to Mr. Beard and his associates — claimant's predecessors in title — were not revoked. (*Rasch* v. *Nassau, etc., R. Co.*, 198 N. Y. 385; *Mayne* v. *Nassau, etc., R. Co.*, 151 App. Div. 75; 210 N. Y. 607; *L., etc., R. R. Co.* v. *Canal Board*, 146 App. Div. 160; 204 N. Y. 471; *C. I., etc., R. Co.* v. *Kennedy*, 15 App. Div. 588; *S. R. T. Co.* v. *City of New York*, 128 N. Y. 510.)

*Charles E. Hughes* for Title Guarantee and Trust Company, intervening. The claimant's predecessor held title in fee to the lands appropriated, assuming that the legislature had power to grant such title. (*People* v. *Canal Appraisers*, 33 N. Y. 461; *Wetmore* v. *A. W. L. Co.*, 37 Barb. 70; *Williams* v. *Mayor, etc.*, 105 N. Y. 419; *Towle* v. *Remsen*, 70 N. Y. 303; *N. Y. El. Lines Co.* v. *E. C. Subway Co.*, 235 U. S. 179; 218 N. Y. 417; *Archibald* v. *N. Y. C. & H. R. R. R. Co.*, 157 N. Y. 574; *Spokane & B. C. R. Co.* v. *Washington, etc., R. Co.*, 219 U S. 166; *United States* v. *Tenn. & Coosa R. Co.*, 176 U. S. 242; *Abbott* v. *Curran*, 98 N. Y. 665; *People* v. *S. P. Co.*, 218 N. Y. 459.) If the act of 1873 be deemed to be invalid, still the legislature had abundant power to pass by a two-thirds vote a curative act which would leave no doubt as to the legislative intent. (*Matter of N. Y. El. R. R. Co.*, 70 N. Y. 327; *Sweet* v. *City of Syracuse*, 129 N. Y. 316; *State ex rel. Allison* v. *Corker*, 67 N. J. L. 596; *People ex rel. Olin* v. *Hennessy*, 206 N. Y. 33; *People ex rel. Callahan* v. *Board*, 174 N. Y. 169; *United States* v. *Freeman*, 3 How. [U. S.] 556; *Cope* v. *Cope*, 137 U. S. 682; *People ex rel. City of Rochester* v. *Briggs*, 50 N. Y. 553; *Willis* v. *City of Rochester*, 219 N. Y. 427; *Matter of Dept. of Public Parks*, 86 N. Y. 437.)

HISCOCK, Ch. J. By proper proceedings the state appropriated for Barge canal purposes a considerable tract of land situate at the border of and within Gowanus bay, Long Island. The claimant as grantee and assignee of the estate of one Beard asserting its ownership of 1,744,274.51 square feet of the land appropriated and of the crib and pile pier located thereon, filed a claim for upwards of $3,000,000 for the lands appropriated and consequential damages to adjacent lands not appropriated. The lands asserted by the claimant to belong to it and which were thus appropriated included a small strip of upland and a small amount of land originally under water and which had been filled in, but for the most part consisted of lands which are described as "salt meadows, drained marsh and mud flats which were partially submerged at high tides," and which land "is under water and consequently within the tideway" of Gowanus bay.

By stipulation of the state and the claimant, all questions of law involved in said claim and expressly including the question of title to the land were referred to Albert Haight, former judge of this court, and official referee, with the provision that after the determination by him of said questions, if in favor of claimant, the trial of the issue of the amount of damages should proceed before the Board of Claims. After a long and careful trial the referee made a decision with findings of fact and conclusions of law to the effect that said claimant was the owner in fee of 1,422,022 square feet of the lands appropriated under and by virtue of grants contained in certain acts of the legislature, and was entitled to be compensated for said land, but was not entitled to any consequential damages. The Board of Claims adopted the findings and conclusions thus made and reached by the referee, made additional ones, and awarded the sum of seventy-five cents per square foot as compensation for the land which was thus found to have been taken from the claimant.

There will be considered first the theory under which this has been done, and then the later theory by which it is now sought to uphold what has been thus done.

From the findings it appears that comparatively early in the history of Brooklyn William Beard was an upland owner whose lands bordered on Gowanus bay, in the locality involved in this proceeding. From time to time prior to the passage by the legislature of three acts which the referee substantially finds gave to the claimant's assignor title to the lands for which compensation has been awarded, and which will hereafter be referred to at length, various acts were passed which either established bulkhead and pier lines extending in front of the Beard lands, or authorized Beard and others to build and maintain sea walls, piers, docks, wharves, etc., and to fill in the lands lying under water in front of their uplands within the bulkhead and pier lines thus established. It does not seem necessary at this point to quote or refer at length to all of these statutes. It may be stated generally that none of them did more than grant to Beard and others the privilege to build wharves, etc., and fill in lands; none of them purported in terms to grant and convey the title to lands under water included within the area now appropriated and none of them was passed by a two-thirds vote.

On the original argument much emphasis was placed by the attorney-general upon certain language contained in one of these acts as supplying the basis for a reversal of the views which have been adopted by the courts below and the judgment which has been founded thereon.

This act was chapter 856 of the Laws of 1866, and was entitled "An Act to authorize William Beard and others to erect, construct, build and maintain * * * docks, wharves, bulkheads, piers, and warehouses and a basin for commercial uses in front of their lands in the twelfth ward of the city of Brooklyn." It authorized said beneficiaries to do the things mentioned in the title of said act

and to fill in lands under water in front of their upland within the bulkhead and pier lines established in front of said premises. This permission covered all or part of the appropriated premises and it is the final section of the act upon which the attorney-general placed importance. This section provides: "This act shall not take effect until the consent of the commissioners of the land office shall first be obtained to use the privileges intended to be granted by this act," and the attorney-general argued that because of this last provision, it was not the intent of the state that any grant to claimant's predecessor should be effective unless made or approved by the land commissioners and which approval at the time of the original argument did not appear to have been given. On the re-argument, however, there was produced and filed without objection a certified copy of an instrument appearing to give the prescribed consent.

Then we come to the three acts which have been deemed to be decisive ones in the determination of the case, and for the better understanding of which it is necessary to state a few introductory and closely related facts.

Prior to June 10, 1873, a board of officers had been appointed by the president to examine into and revise the exterior and bulkhead lines of the harbor of New York on the Brooklyn side in pursuance of a concurrent resolution adopted by the senate and assembly, and said board had made a report recommending the location and course of such a pier line. Said board apparently had stated in said report that it had the requisite data for determining the pier line in Gowanus bay in front of the premises in question but deemed it advisable to postpone its recommendation of that portion of the line to a future report.

June 10, 1873 (L. 1873, ch. 702), the legislature adopted the first of the acts in question entitled " An act to establish bulkheads and pier lines adjacent to the shores of the port of New York in the county of Kings." Said act

declared the pier line so far as recommended by the above board to be the lawful pier line for that portion of the shore, and, what is especially important, it provided that it should be " lawful for the owners of real estate fronting on the water between * * * Hamilton Ferry, in the city of Brooklyn, and Bay Ridge avenue, in the town of New Utrecht, [and which included that portion of the shore here involved] to construct and maintain bulkheads, or wharves and piers * * * ; and to fill in the same on the lands under water in front of their lands to the exterior bulkhead and pier lines so to be recommended [thereby referring to the bulkhead and pier lines to be recommended by said board of officers in its future report], subject, nevertheless, to the action of the legislature at its next session."  This act was not passed by a two-thirds vote.

The legislature at its next session did not take any action pertaining to this subject, but at its session in 1875 it passed the second of these acts (L. 1875, ch. 398) entitled " An act to amend an act entitled ' An act to authorize William Beard and others to erect, construct, build and maintain sea-walls or break-water piers, docks, wharves, bulkheads, piers and warehouses, and a basin for commercial use in front of their lands in the twelfth ward of the city of Brooklyn,' passed April twenty-fourth, eighteen hundred and sixty-two, and also to amend an act bearing the same title, passed April thirtieth, eighteen hundred and sixty-six."

This act after reciting that the board of officers appointed to examine into and revise the exterior and bulkhead lines of the harbor of New York on the Brooklyn side, in pursuance of the concurrent resolution of the senate and assembly passed April 6, 1872, recommended the modification of the lines and spaces of the Erie basin and the Brooklyn basin in accordance with the changes shown on a map annexed to said report and

that William Beard and others, owners of the water front and lands adjacent to said basins were desirous of carrying out the changes and modifications recommended in said report, proceeded to fix the "pier, bulk-head and other lines adjacent to the shores of the Brooklyn side of the port of New York" between certain points, and the act stated that the new lines established were shown on a map entitled "map showing plan for the improvement of the water front and adjacent lands in the twelfth ward of the city of Brooklyn, New York, owned by William Beard * * * and others, dated March first, one thousand eight hundred and seventy-five, Leander N. Vibbard, city surveyor." This was the second one of the three acts found by the referee to be of controlling importance in granting to claimant the rights claimed by it, but it was not passed by a two-thirds vote.

The learned referee in effect found as matter of fact that this act fixed new bulkhead lines extending in front of the premises owned by Beard and others and outside of the lands appropriated. He found "The map made by Leander N. Vibbard, City Surveyor, dated March 1, 1875, correctly shows the pier and bulkhead lines established by Chapter 398 of the Laws of 1875, and was made the official map of said lines by said act. The Newton Map * * * referred to in Chapter 491 of the Laws of 1884, shows the exterior boundary line of the property then owned by the claimant's predecessor in title to be the same as that shown on the map of Leander N. Vibbard * * * and as laid down by Chapter 398 of the Laws of 1875. * * *." There is considerable controversy in respect of this so-called finding of fact which does not seem to be especially material in the light of the views which I take concerning the case. It seems evident that so much of said finding as states that the Newton map "shows the exterior boundary line of the property then owned by the claimant's predecessor in title" is a conclusion of law rather than a finding of

fact, and outside of the identification of certain lines which is accomplished by this finding, I think it is largely controlled by other findings and conclusions of law which were adopted by the referee.

Then, of importance in connection with the third and last of said three acts and next to be considered, the referee found as a matter of fact: "The lands surrounding that appropriated by the State has in recent years been filled in by claimant's predecessor in title up to a level with the surrounding country and the city grade of streets, six or eight feet above mean high water. The filling also extends across the corner of the lands appropriated outside of that which was formerly high land. *All of the rest of the land appropriated is under water and consequently within the tideway.*"

The remaining act now in mind is chapter 491 of the Laws of 1884, and is the one of the three acts which the referee found finally gave and granted to claimant's predecessor the right in and to lands on Gowanus bay for which the award has been made. The title of said act is of much importance. It is "An Act to ratify and confirm certain grants made in pursuance of section three of chapter seven hundred and two of the laws of eighteen hundred and seventy-three," and which was the act and section already referred to giving to Beard and others the right to construct docks and fill in land in front of their premises in the locality in question. This act of 1884, unlike all of the preceding ones, was passed by a two-thirds vote, and it is of such culminating importance that it seems proper to quote it in full.

It reads: "Section 1. The map filed in the office of the secretary of state on the fourth day of March, eighteen hundred and eighty-four, entitled 'chart of pier and bulk-head lines of Gowanus bay, New York harbor, as recommended by the special board of eighteen hundred and seventy-five,' and certified by John Newton, colonel of engineers, brevet major-general, to be a full, true and

correct copy of a map made by the commissioners appointed under concurrent resolutions relative to the pier and bulk-head lines in the harbor of New York, passed in Senate February seventeen, eighteen hundred and seventy-two, and in Assembly April six, eighteen hundred and seventy-two, and presented by the said commissioners to the governor, pursuant to section three of chapter seven hundred and two of the session laws of eighteen hundred and seventy-three, recommending certain pier and bulk-head lines in Gowanus Bay, and the copy of the report of said commissioners, certified by said John Newton, colonel of engineers, to be a full and correct copy of the original report presented to the governor, together with said map, shall be held in all courts and before all tribunals to be sufficient evidence of the contents and effect of the original map and report made by said commissioners, and shall be of the same force and effect as said original map and report, and all grants of land under water within or to the exterior boundary line appearing upon said map and report made by the state, are hereby made to extend by the same course and direction to such exterior boundary line, and are hereby ratified and confirmed as thus extending to the grantees thereof, and their assigns in fee simple."

Upon the facts and legislation which have now been referred to, and other facts of a formal nature, which it is not necessary to refer to at length, the referee adopted certain conclusions of law which have been made the basis of the judgment in favor of the claimant, and which are as follows:

" I. The lands appropriated by the State in these proceedings with the exception of the highlands running across the corner described in No. VII of the Findings of Fact, being covered by the tideway, originally belonged to the State.

" II. The provisions of the statute to the effect that it shall be lawful for William Beard and others, owners of

real estate fronting upon the waters of the bay, their heirs, and assigns, to erect, construct, build and maintain a sea-wall or breakwater pier, docks, wharves, bulkheads, piers and warehouses and a basin for commercial purposes on the lands under water in front of their premises and to fill in the same, is not a grant of a fee to such land; but is a permit by which, in so far as such owners of uplands have under the authority of the statute entered upon and improved the same by filling in, or the construction of piers, docks, wharves, bulkheads, etc., they have acquired a property right in the premises which, under the circumstances of this case, they could not be deprived of without compensation.

" III. The claimant's predecessor in title having acquired rights to lands under water by reason of the filling in of the same as appears from the eighth finding of fact herein and referred to in the above second conclusion of law, such rights were by virtue of Chapter 491 of the Laws of 1884 changed into an estate in fee simple and such estates of such owners were by virtue of such statute extended over the lands under water from such filled in lands to the exterior boundary of the new bulkhead line established by the Act of 1875. The provisions of this Act, however, were not intended to cover the lands set apart for the Henry Street basin nor the Hicks Street basin, neither was it intended to include the fee of Henry Street or Columbia Street as laid out and opened by Section 2, Chapter 327, of the Laws of 1876."

The final conclusion quite completely summarizes the theory upon which the award was made.

For the purposes of discussion at this point it seems to be unnecessary to determine what were the exact nature and extent of the privilege which was granted by the act of 1873, and perhaps by other acts, to claimant's predecessor to erect docks and wharves on, and fill in the submerged land included within the area appropriated by the state. That question will be considered hereafter.

These acts did not in terms exact any consideration for the privilege thereby granted and if this privilege amounted to an exclusive and valuable right and interest to, over or in said submerged land which could only be taken away on payment of compensation, then certainly said acts come within that provision of the Constitution which ordains that " The assent of two-thirds of the members elected to each branch of the Legislature shall be requisite to every bill appropriating the public moneys or property for local or private purposes," (Art. 3, section 20) and said acts were not passed by such vote.

It is barely suggested by claimant that within the doctrine of *Wetmore* v. *Brooklyn Gas Light Co.* (42 N. Y. 384) this lack of a constitutional two-thirds vote for these bills cannot be urged as a defense to this claim, but we think that proposition if seriously urged could not be sustained.   The *Wetmore* case presented the question in an entirely different form than that in which it now arises.   There a stranger was urging that certain grants by the state to another which he was attempting to violate or disregard were unconstitutional and it was said by the court under the circumstances of that case that that was a proposition to be urged by the state if anybody and that the stranger had no interest in it.   Here it seems to be very plain that in an attempt by a claimant to make the state pay for rights in real property claimed to have been obtained from it, the state may answer that the acts of its legislature were unconstitutional and that thereby no such right or interest ever passed as that for which compensation is sought from it.

Therefore, the ultimate support of claimant's claim of title to these premises and of its right to compensation therefor must be sought in the act of 1884 already quoted, and this was fully recognized by the learned referee in giving to it the effect he did.   In my opinion, however, it will be found that various obstacles, constitutional and others, prevent the act from accomplishing

the results which were credited to it by him and by the courts below.

The title of this act described it as one " to ratify and confirm *certain grants* made in pursuance of section three of chapter seven hundred and two of the laws of eighteen hundred and seventy-three." The body of said act provides " all *grants of land under water* within or to the exterior boundary line appearing upon said map and report made by the state [referred to in preceding lines of the act and being the line established by said act of 1875] are hereby made to extend by the same course and direction to such exterior boundary line, and are hereby ratified and confirmed as thus extending to the grantees thereof, and their assigns in *fee simple.*" The language of this act, whether in its title or its body, is not entirely accurate and apt when the attempt is made to apply it to the facts found in this proceeding, for the purpose of carrying out claimant's theory. In the plainest meaning of language no " grants" appear to have been made to claimant's predecessor " in pursuance of " section three of chapter seven hundred and two as stated in the title of said act and no " grants of land under water" were made as specified in the body of the act. But we shall accept at this point for purposes of discussion the theory which was adopted by the learned referee. As has already been stated, he held that the original act of 1873 did not grant or convey any lands under water but merely bestowed upon claimant's predecessor the privilege to build docks, etc., and to fill in lands and that when this privilege had been exercised the parties exercising it for the first time acquired rights which were in the nature of a grant, of which they could not be deprived without compensation and which might be regarded as described in and coming within the *confirmatory* provisions of the act of 1884.

Accepting this interpretation, however, we then encounter further and even more serious difficulties.

Assuming that the act of 1884 by the use of the terms "grants of land under water" was intended to refer to lands which had been filled in or docks or piers which had been erected, and to confirm and ratify grants acquired by that process, manifestly it would only refer to and confirm grants in that manner secured by filling in land by construction prior to the passage of the act in 1884. By its terms it did not and could not very well refer to and confirm grants of lands arising through what was done in the future. There is nothing in the findings of fact which fairly indicates that any of said lands had been filled in before the act of 1884 was passed. The only finding on this subject is that certain lands had been filled in "in recent years" and which expression would hardly carry back of the period of thirty years which had elapsed between the date when the act was passed and the findings made. So much for the confirmatory features of the act.

We now pass to the consideration of other difficulties with this act. As has been noted, its title stated that it was an act "to ratify and confirm certain grants" made in pursuance of a certain act. The only theory on which the courts below have held that there were any "grants" which came within the terms of this title and of the body of the act so as to be the subject of confirmation within its provisions is the one already referred to that by filling in lands under the permission granted by the act of 1873 and other acts upland owners "obtained a property therein in the nature of a grant" which the legislature had the right by said act of 1884 to recognize and protect.

Assuming at this point that all filling of the lands in question had been done prior to the passage of the act of 1884, and that, therefore, all of the lands thus filled in became the subject of a grant which was subject to confirmation by the terms of said act, it nevertheless has been found that the lands so filled in constituted a very small portion of the area lying between the uplands of

claimant's predecessor and the bulkhead and pier lines established by the act of 1875, and of the appropriated area. The finding of fact which especially covers this subject reads as follows:

"VIII.. The lands surrounding that appropriated by the State has in recent years been filled in by claimant's predecessor in title up to a level with the surrounding country and the city grade of streets, six or eight feet above mean high water. The filling also extends across the corner of the lands appropriated outside of that which was formerly high land. All of the rest of the land appropriated is under water and consequently within the tideway."

Claimant's title to the balance and great portion of the area for which it has received compensation must, therefore, rest on the other provisions of said act of 1884, wherein it is provided that " all grants of land under water within or to the exterior boundary line appearing upon said map and report made by the State, *are hereby made to extend by the same course and direction to such exterior boundary line, and are hereby ratified and confirmed as thus extending to the grantees thereof and their assigns in fee simple.*"

Disregarding the singular inappropriateness of an act which purports to ratify and confirm something which by it is being done for the first time, we have it that on claimant's theory as sustained thus far by the courts, this act by calling it an "extension" in fact attempted to grant to claimant's predecessor for the first time the title to all of the unfilled land lying between the portions which had been filled in and which for that reason have been regarded as coming within the term "grants" and subject to confirmation, and the exterior lines then recently established, and which constitutes the bulk of the lands for which compensation has been awarded. The act thus not only confirms what the courts below have decided to regard as grants, but conveys title to a new lot of land

many times the size of that whereof title was confirmed, and which latter and original grant was not in any manner referred to in the title of the act.

It seems to me that because of these circumstances the act was obviously a private one and clearly and flagrantly violates that provision of the Constitution (Article 3, section 16) which says: "No private or local bill, which may be passed by the Legislature, shall embrace more than one subject, and that shall be expressed in the title."

A member of the legislature who examined the title of this act and who was conversant with the facts would have been led to believe on the theory most favorable to claimant's predecessor, that this act was intended to give him title in fee to lands under water which had been filled in at his expense and might very well say that that was a fair thing to do. Such a member never would have been led to suspect by the title of the act that it was the intent in addition to grant the title in fee to a very much larger tract of land which the beneficiaries had never improved, and which under the grant then being attempted they might hold without improvement indefinitely until some opportune time should arrive for asserting their title. As I have said, I think that such an act clearly violates the Constitution. (*Economic Power & C. Co.*, v. *City of Buffalo*, 195 N. Y. 286.)

So it results that the theory under which the award was made and has been upheld is faulty because prior acts giving the privilege to fill in were not adopted by the necessary votes, and the act of 1884 attempting to eliminate this difficulty and give title to lands whereof what was in the nature of a grant had been obtained by filling in (save for lack of necessary votes), violated the Constitution by attempting also to give a fee to a large amount of land which had not been filled in, and which latter purpose was not at all disclosed in the title.

Apparently these or other defects in the theory thus far adopted to uphold this claim have impressed themselves

upon the judgment of claimant's counsel, for upon the reargument it was largely abandoned and a new one adopted. This later theory is that under the terms of the various acts which have been referred to, and independent of any supplemental process of filling in, claimant's predecessor acquired title in fee to the lands appropriated. Of course if this theory is sound it eliminates the difficulties which have been pointed out springing from the necessity of filling in the lands in order to establish a grant and perfect title to all of the appropriated area under the provisions of the act of 1884. We do not think, however, that this theory can be sustained.

Independent of the constitutional objection that they were not passed by a two-thirds vote, the acts prior to the one of 1884 did not by their terms purport to grant and convey the lands under water. They simply granted a privilege of filling in or erecting improvements upon those lands. We may assume that as a necessary incident to this privilege it was implied that when the privilege had been exercised and the lands filled in the beneficiary of the grant would become the owner thereof. This implication was necessary in order to secure the enjoyment and fruits of the privilege which was granted, and this is the view which was correctly adopted by the learned referee. (See, also, *Williams* v. *Mayor, etc., of N. Y.*, 105 N. Y. 419.)

But no controlling authority has been called to our attention which fairly holds that the grant of a mere privilege to fill in tidewater lands, so long as unexercised, conveys title. The case of *O'Donnell* v. *Kelsey* (10 N. Y. 412), which has been cited by counsel for the claimant as establishing a contrary doctrine, does not do so. That case involved the interpretation of certain acts authorizing riparian owners to dock out into tidewater, and it seems to have been assumed that they thereby acquired title to the lands under water. The controversy, however, was entirely between adjoining owners over the

location of boundary lines, and in which controversy there was no motive to question or depreciate the extent of the grants which had been made to them by the state, and the questions here being discussed were not raised or considered.

Reaching the conclusion that these prior acts did not convey title to the lands under water unless filled in it becomes necessary for certain purposes to determine what were the extent and nature of the right granted before it had been exercised. This precise question does not appear to have been definitely settled in this state. In various states it has been held that all that is granted by such an act is a mere license, revocable by the state at will and without payment of compensation. (*N. Y., L. E. & W. R. R. Co.* v. *Yard*, 43 N. J. L. 632, 636; *State* v. *Mayor*, 25 N. J. L. 525; *Stevens* v. *Paterson & Newark R. R. Co.*, 34 N. J. L. 532; *People* v. *Cal. Fish Co.*, 166 Cal. 576.)

I think, however, that the privilege amounts to more than this, and that an act granting the right to fill in lands under water, and thereby acquire title to the same, gives an inchoate, vested interest in the lands described which is a property right and of which, unless forfeited or lost in some way, the grantee cannot be deprived without compensation. This view is supported in various ways.

In the first place the rights which a grantee named in such an act acquires thereunder are quite analogous to those which a riparian owner upon public waters enjoys. In the latter case we hold under principles of common law that the riparian owner has certain rights in and over the foreshore of which he cannot be deprived without compensation. (*Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79.) In the present case the legislature by grant gave certain rights and privileges in and over the lands under water, and it would seem as though these also should be protected against destruction without compensation.

In the second place I think the preponderance of author-

ity in other jurisdictions is in favor of this view, and that indirectly it is sustained by what has been said in some of our own decisions. (*Hodson* v. *Nelson*, 122 Md. 330; *Bradshaw* v. *Duluth I. M. Co.*, 52 Minn. 59; *City of Boston* v. *Lecraw*, 17 How. [U. S.] 426, 433; *Fitchburg R. R. Co.* v. *Boston & Me. R. R.*, 3 Cush. 58; *Yates* v. *Milwaukee*, 10 Wall. [U. S.] 497; *Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Bradford* v. *McQuesten*, 182 Mass. 80; *Hamlin* v. *Fairpoint Mfg. Co.*, 141 Mass. 51; *Norfolk City* v. *Cooke*, 27 Grat. [Va.] 430; *Clement* v. *Burns*, 43 N. H. 609; *Hanford* v. *St. P. & Duluth R. R. Co.*, 43 Minn. 104; *Miller* v. *Mendenhall*, 43 Minn. 95; *Lockwood* v. *N. Y. & N. H. R. R. Co.*, 37 Conn. 387.)

It, perhaps, is unnecessary to give a specific name to this right, but if we are to do this, it may as aptly be termed a franchise as anything else. (*Trustees of Southampton* v. *Jessup*, 162 N. Y. 122.) I think it possesses the nature of a franchise in one respect which may be of importance in this case. The only motive in the nature of a consideration for the grants which were made to claimant's predecessor was the one that he would exercise the privilege which was granted and by filling in the lands and erecting docks contribute to the commercial resources and facilities of the city of Brooklyn and save the state the expenses and uncertainties which it might incur if it embarked on this undertaking. (*Williams* v. *Mayor, etc., of N. Y.*, 105 N. Y. 419, 436.) This, I have no doubt, was a necessarily implied condition of the grants and for a failure to comply therewith they could have been forfeited by the state. This principle, as applicable to the present situation, can be no better stated than was done in respect of a franchise in *New York Electric Lines Co.* v. *Empire City Subway Co.* (235 U. S. 179, 193, etc.) and where it was said: "Grants like the one under consideration are not nude pacts, but rest upon obligations expressly or

impliedly assumed to carry on the undertaking to which they relate. (See *The Binghamton Bridge*, 3 Wall. 51, 74; *Pearsall* v. *Great Northern Railway Co.*, 161 U. S. 646, 663, 667.) They are made and received with the understanding that the recipient is protected by a contractual right from the moment the grant is accepted and during the course of performance as contemplated, as well as after that performance. The case of *Capital City Light & Fuel Company* v. *Tallahassee* (186 U. S. 401), to which the defendant in error refers, is not opposed. There the complainant, upon the ground of an exclusive privilege, sought to enjoin a municipality from operating its own electric light plant; although ten years had elapsed since the complainant's grant, the complainant had done nothing whatever to establish an electric light business and under the express terms of the statute the exclusive privilege had not attached. (186 U. S. 410.)

" But, while the grant becomes effective when made and accepted in accordance with the statute and the grantee is thus protected in starting the enterprise, it has always been recognized that, as the franchise is given in order that it may be exercised for the public benefit, the failure to exercise it as contemplated is ground for revocation or withdrawal. In the cases where the right of revocation in the absence of express condition has been denied, it will be found that there has been performance at least to some substantial extent or that the grantee is duly proceeding to perform. And when it is said that there is vested an *indefeasible* interest, easement, or contract right, it is plainly meant to refer to a franchise not only granted but exercised in conformity with the grant. (See cases cited *supra.*) It is a tacit condition annexed to grants of franchises that they may be lost by misuser or non-user. (*Terrett* v. *Taylor*, 9 Cranch, 43, 51; *Chicago Life Insurance Co.* v. *Needles*, 113 U. S. 574, 580; *Given* v. *Wright*, 117 U. S. 648, 656.) The condition thus implied is, of course, a condi-

tion subsequent. The same principle is applicable when a municipality under legislative authority gives the permission which brings the franchise into being; there is necessarily implied the condition of user. The conception of the permission as giving rise to a right of property in no way involves the notion that the exercise of the franchise may be held in abeyance for an indefinite time, and that the right may thus be treated as a permanent lien upon the public streets, to be enforced for the advantage of the owner at any time, however distant. Although the franchise is property, 'it is subject to defeasance or forfeiture by failure to exercise it (*People* v. *Broadway R. R. Co. of Brooklyn*, 126 N. Y. 29), or by subsequent abandonment after it has been exercised (*People* v. *Albany & Vermont R. R. Co.*, 24 N. Y. 261).' If 'no time is prescribed, the franchise must be exercised within a reasonable time.' (*City of New York* v. *Bryan*, 196 N. Y. 158, 164.)"

With the expression of these views in respect of the prior acts and of the situation thereunder of claimant's predecessor we come now to the consideration of the statute of 1884, and which it seems necessary, although at the risk of some repetition, to discuss briefly again for the purpose of determining its proper position and effect in the chain of statutes relied on by the claimant on its present theory.

Its title as of an act " to ratify and confirm certain grants made in pursuance of section three of chapter seven hundred and two of the laws of eighteen hundred and seventy-three " while somewhat inapt, can, we think, be applied to grants of the privilege to fill in made to claimant's predecessor " in pursuance of," that is under or by virtue of, the terms of section 3 of the act of 1873. The term " grants " was not inappropriate to describe the gift or conveyance by the state of such a privilege as we hold that given to claimant's predecessor was, and the reference to the particular statute and section thereof

whereby these " grants " were made helps to identify the subject referred to. The words used in the body of the act describing the privileges as " grants of said lands under water " were less appropriate. Nevertheless these words connected in interpretation with those used in the title and specifically referring to section 3, chapter 702, Laws of 1873, identified the rights which it was intended to confirm, and I do not think this intention should be frustrated because language somewhat inapt to the intent mentioned has been used.

The more serious difficulty with the act is of course the one already referred to, that in the body it transgresses the constitutional prohibition by dealing with more than one subject and with matters not disclosed in the title. Keeping it in mind that prior acts had simply given a privilege or franchise to fill in lands this act purports to accomplish three separate purposes. It purports to extend the area covered by prior acts to the newly-established bulkhead line. It attempts to amplify what we have held to be a privilege or right or franchise into an estate in fee. It then, except for this extension and amplification, does what was fairly disclosed in the title — ratifies and confirms prior grants.

It is said that as a matter of fact the act did not operate to extend the area of land already covered by prior acts. That can more clearly be determined upon another hearing. If it did have that effect it was a violation of the Constitution, which required the object of the statute to be stated in its title. It certainly was in conflict with the Constitution in attempting to enlarge the grant of a mere right or privilege not theretofore exercised, although property, into a title in fee. I think, however, that the constitutional and unconstitutional provisions of the statute are so independent and separable that the statute may be upheld in respect of the former, although condemned so far as concerns the latter purposes. That general subject of upholding separable constitutional provisions of a

statute when other unconstitutional provisions must fall has been recently considered by this court, and within principles there approved it seems to me that it may be said that this statute may be allowed to operate to the extent of confirming the grants previously made and thereby eliminating the defect of lack of the necessary votes, even though it is unconstitutional in respect of the other purposes to enlarge those rights.   (*Dollar Company* v. *Canadian C. & F. Co.*, 220 N. Y. 270.)

These views will lead to a reversal of the award which has been made and to a new hearing.   The question of value has not been determined under rules which we regard as properly applicable to whatever rights the claimant enjoyed.   An award at so much a square foot has been made for the area which has been filled in and for that which has not been filled in on the theory that the claimant owned the fee.   This was clearly incorrect. The value of a franchise to acquire title to land by filling in will not necessarily be the same as the value of the fee before the land has been filled in.   The value of the right in this respect will be the value of the land when filled in less the cost of filling and the addition of value as the result of filling in may be greater or less than the cost of the latter operation.   In addition, there may be other features which will differentiate the value of a fee and the value of a right to acquire a fee which is subject to continuing conditions and continuing obligations.

For instance, the liability to forfeiture of claimant's rights for non-user has been somewhat discussed by counsel and considered by us.   If it should appear on the new hearing which is necessary that at the time of the appropriation by the state claimant's franchise had become subject to forfeiture or to a *bona fide* serious claim of forfeiture, this might be claimed to be an element to be considered in fixing its market value in these proceedings.   While we have deemed it necessary in determining the character of claimant's rights to indicate

our views in respect of a liability to forfeiture for non-user, we shall not express any opinion upon the question whether the findings indicate a liability to forfeiture at the time of the appropriation or whether liability to such forfeiture or to a serious claim thereof, if established, could properly be considered in these proceedings in fixing values. Those questions were not tried or considered in the courts below, at least under any such theory as we are holding to be applicable to claimant's position and we deem it more just to withhold our consideration of them, if necessary at all, until such consideration has been had.

There may be still other conditions which would be a proper subject of consideration in fixing values upon the theory which we have adopted. We are not attempting to foresee and make a full and complete statement of every one of these. We are simply stating some of them to sustain the proposition that there must be a new hearing of the claim.

We think that the appeal of the claimant from so much of the decision as refuses to make any allowance on account of the land included within the lines of Henry street and of Columbia street is without foundation and that the determination should be upheld. The lines of these proposed streets run through the appropriated area to the bulkhead line, and the portions of them in question consist of lands under water. These lines, so far as material here, were fixed by chapter 327 of the Laws of 1876. Said statute after providing for the lines and continuation thereof to the bulkhead line provided in the case of each street: "Said last mentioned street is hereby opened and established." Because portions of said street included in the appropriated area have never been filled in, improved or traveled the claimant insists that its predecessor and it have acquired the same rights therein as in the rest of the territory under the provision of the statute, now Highway Law, section 234, which says that "every highway that shall not have been traveled or used as a high-

way for six years shall cease to be a highway." We do not think that statute is applicable to the facts here appearing.

At the time the above statute of 1876 was passed the state had a right as against claimant's predecessor to devote the land to street purposes on any condition which it saw fit to adopt. Because of the unconstitutionality of prior statutes purporting to give Beard and others the right to fill in, those people had acquired no rights which could be asserted as against the state or which prevented the state from withdrawing said land from any claims whatever against it by said persons. Under these circumstances it laid down the lines for the streets in question and declared them to be thereby "opened and established." It can hardly be believed that the state in so doing assumed that the streets would be improved and traveled in any ordinary way within six years. They were part of a general tract which was to be filled in by other people and in view of what has happened since we scarcely ought to charge the state with entertaining the expectation that Beard and his associates would fill in this land and create the necessity or even desirability of filling in and improving the street areas within six years. Prior to 1884 when the confirmatory act was passed no steps had been taken to work or assert an abandonment of these areas for street purposes. Like the rest of the tract, they laid there subject to future development and improvement. Under these circumstances when the legislature adopted the confirmatory act of 1884 I think we ought to assume that it did not intend to assert against itself an abandonment and turn over to Beard and his associates the areas included within these lines, simply because the public authorities had pursued the same waiting policy that the beneficiaries under the other acts had adopted. This would virtually have amounted to a repeal of the act of 1876 and we think it is much more reasonable to interpret the act of 1884 as confirming

rights granted to claimant's predecessor under the act of 1873, less and excepting therefrom the area which intermediate the two acts had been appropriated by the state to street purposes.

Complaint has also been made by the claimant because as supposed by it no award was made for lands included within the lines of Hallock street and Bay street, as shown on the appropriation map. This complaint, however, seems to be based upon a misconception of the award. The Board of Claims found in response to claimant's request "that the area of the premises included within the lines of the appropriated area excepting therefrom the lands set apart for the Henry street basin and the Hicks street basin and the land included in Henry street and Columbia street as laid out and opened * * * is 1,442,022 square feet," and the award made in favor of claimant was for that number of square feet. Therefore, the area included within the lines of Hallock and Bay streets was not excluded from the award.

Various references are made by counsel to the report concerning the building of the barge canal and to the act providing for the acquisition by the state of lands necessary for that purpose and the supposed or alleged interest of claimant's predecessor in this tract of land. It is not asserted by the claimant that these references served in any manner to confirm or extend or fortify the title of its predecessor, and, as already stated, we agree with its counsel on the other hand that the appropriation of this land under the Barge Canal Act did not amount to a proceeding to forfeit any rights which the claimant might have in said premises.

The order of the Appellate Division and the determination of the Board of Claims should be affirmed, with costs in this court and in the Appellate Division so far as they hold that claimant is not entitled to any award on account of so much of the appropriated area as is included within the lines bounding and defining Hicks street and

Henry street basins and within the lines of Henry street and Columbia street, and otherwise said order and determination should be reversed and a new hearing granted, with costs to abide event.

Crane, J. (dissenting). There are three reasons why the award made to the claimant herein should be sustained and the judgment of the Appellate Division affirmed.

*First.* By various acts of the legislature, William Beard and others, upland owners at Gowanus bay, were given the right to fill in the lands under water in front of their premises up to certain defined lines. The act of 1866 (Chap. 856) established the Brooklyn basin and gave to Beard the right " to build, construct and maintain a bulkhead with solid filling on the line established by the legislature of this State by chapter seven hundred and sixty-three, of the laws of eighteen hundred and fifty-seven, * * * and to fill in the land under water between high water line of the upland belonging to said owners of said real estate and the bulkhead hereby authorized to be constructed." The owners were also authorized to construct a pier running out from the bulkhead and a sea wall inclosing a basin of water between the sea wall and the solid filling upon the bulkhead line, which basin was to be known as " The Brooklyn Basin."

The act was not to take effect until the consent of the commissioners of the land office should first be obtained " to use the privileges intended to be granted by this act." The consent of the commissioners was thereafter obtained.

By chapter 702 of the Laws of 1873 and chapter 398 of the Laws of 1875, the bulkhead lines at Gowanus bay were materially changed in accordance with the report of a board of officers appointed by the president in pursuance of a concurrent resolution of the senate and assembly, passed April 6, 1872. The latter act provided: " Whereas,

the board of officers appointed by the President  *  *  *
recommended the modification of the lines and spaces of
the  *  *  *  Brooklyn Basin in accordance with the
changes shown on a map annexed to said report; and,
Whereas, William Beard, Jeremiah P. Robinson, Frank-
lin Woodruff and others, owners of the *water front and
lands adjacent to*  *  *  *  *said Brooklyn Basin* are
desirous of carrying out the changes and modifications
recommended in said report; now, therefore, the People
of the State of New York  *  *  *  do enact as follows:
Section 1. The pier, bulkhead and other lines adjacent to
the shores on the Brooklyn side of the port of New York
*  *  *  are hereby altered, declared and established as
follows, that is to say: " Then follows a detailed statement
of the changes, summed up at the end in these words:
" The new lines hereby established being shown on a map
entitled, ' map showing plan for the improvement of the
*water front and adjacent lands* in the twelfth ward
of the city of Brooklyn, New York, owned by William
Beard, Jeremiah P. Robinson, Franklin Woodruff and
others, dated March first, one thousand · eight hundred
and seventy-five, Leander N. Vibbard, city surveyor.' "
The bulkhead line established according to this Vibbard
map was so changed as to create two basins, each 200 feet
wide, between tongues of land extending out to the sea-
wall or bulkhead line. These basins were known as
" Hicks Street Basin " and " Henry Street Basin " and
were over 2,000 feet in length. Beard and his co-owners
were given the right to fill in solidly the land each side of
these basins up to the bulkhead line as designated on the
map. Thereafter chapter 327 of the Laws of 1876 opened
and *established* Henry street and Columbia street over
the land to be filled in up to the bulkhead line.

The Vibbard map corresponds to the appropriation map
in this proceeding, designating the property to ·be taken
by the state for the canal terminal at this point.

Sufficient has been stated to show that Beard and others,

the owners of the upland, had received from the state rights and privileges in the nature of grants which were very valuable to upland owners.  Something more was done than merely to establish a bulkhead line.  Rights and privileges were given to Beard and others which have never been withdrawn by the state.

The above acts, however, appropriating public property to local or private purposes were passed by a three-fifths vote of the legislature instead of the requisite two-thirds. (Constitution, art. 3, sec. 20.)  To cure this defect chapter 491 of the Laws of 1884 was passed by two-thirds of the legislature, which confirmed the grants theretofore made by the acts of 1873 and 1875, above referred to. The fact that the legislature deemed it necessary to confirm these earlier grants by a two-thirds vote clearly indicates its understanding that private rights were granted in public property.

By appropriate legislation, therefore, the upland owners were granted the privilege and right of solidly filling in the land under water within the bulkhead lines as established by the Vibbard map.  This franchise or right has never been withdrawn or revoked by the state, nor have any direct proceedings been taken to declare a forfeiture thereof.  These valuable rights were owned by Beard, the upland owner, at the time the Barge Canal Terminal Act (Laws of 1911, chap. 746) was passed, authorizing the acquisition of his property at Gowanus bay.  (*Thousand Island Steamboat Co.* v. *Visger*, 179 N. Y. 206, 213; *Archibald* v. *N. Y. C. & H. R. R. R. Co.*, 157 N. Y. 574; *Towle* v. *Remsen*, 70 N. Y. 303; *Fowler* v. *Coates*, 201 N. Y. 257, 263; *New York Electric Lines Co.* v. *Empire City Subway Co.*, 235 U. S. 179, 193; *Mackall* v. *Chesapeake & Ohio Canal Co.*, 94 U. S. 308; *Cluthe* v. *Evansville, M. C. & N. R. Co.*, 176 Ind. 162; *Trelford* v. *Coney Island & B. R. R. Co.*, 6 App. Div. 205.)

The action of the canal board, in seeking to condemn these rights and privileges, or whatever property Beard

had extending out to the bulkhead line, and to pay therefor, would indicate, at least, the recognition upon the part of the state of the existence of certain rights. (*Lehigh Valley R. R. Co. v. Canal Board*, 204 N. Y. 471.) The description of the property taken in this proceeding includes the following: "Being all the right, title and interest which the heirs and assigns of Wm. Beard and others received from the State of New York in the following acts of the State Legislature: Laws of ·1847, chap. 202; Laws of 1851, chaps. 83 and 184; Laws of 1857, chap. 763; Laws of 1866, chap. 856; and Laws of 1875, chap. 398."

We can hardly assume that the state meant to destroy when it proposed to purchase. The canal board act and the proceedings thereunder can in no way be considered acts of forfeiture or proceedings by the state to terminate Beard's interest without compensation. (*Matter of N. Y. & Long Island Bridge Co. v. Smith*, 148 N. Y. 540.)

Non-user does not constitute abandonment. (*Wright v. Milwaukee El. Ry. & L. Co.*, 95 Wis. 29, 37.)

*Second.* In my opinion, chapter 491 of the Laws of 1884 did more than cure prior defective legislation, as above indicated. It confirmed and established the grants of 1873 and 1875 in fee simple.

That the state, having title to the lands under water of Gowanus bay, could grant the same in fee to the upland owner or to anybody else is beyond dispute. (*Wetmore v. Atlantic White Lead Co.*, 37 Barb. 70; *Wetmore v. Brooklyn Gas Light Co.*, 42 N. Y. 384; *People ex rel. Loomis v. Canal Appraisers*, 33 N. Y. 461; *Williams v. Mayor, etc., of New York*, 105 N. Y. 419; *People v. Steeplechase Park Co.*, 218 N. Y. 459.)

The crude language used by the legislature in making such grant cannot affect its validity provided the intention is clear and the provisions of the Constitution are complied with. Thus a grant may be made in fee although the act purports to confirm previous grants

which were not in fee, provided the bill shall embrace but one object, which shall be expressed in the title.

The title of chapter 491 of the act of 1884 reads as follows: "An Act to ratify and confirm certain grants made in pursuance of section three of chapter seven hundred and two of the laws of eighteen hundred and seventy-three." The provisions of the act are contained in but one section, and are to the effect that the John Newton map (same as the Vibbard map) of the bulkhead lines at Gowanus bay, filed in the secretary of state's office on the 4th day of March, 1884, shall be sufficient evidence of the original map made by the commissioners appointed under the concurrent resolution of the senate and assembly in April, 1872, and that the grants of land under water to the exterior boundary line appearing upon said map are ratified and confirmed to the grantees thereof in fee simple. The title and the act deal with but one subject, and that is the grants, or privileges, or rights, conferred by the Laws of 1873 and 1875 above referred to, and it confirms or ratifies these grants in fee. "Confirm" means to strengthen, *to establish, to make more firm.* (Century Dictionary.)

Section 16 of article 3 of the Constitution is complied with when the title is such as to fairly suggest or give a clue to the subject, and, when that is expressed, all matters fairly or reasonably connected with it are proper to be incorporated in the act and are germane to the title. (*Sweet* v. *City of Syracuse,* 129 N. Y. 316, 331; *Astor* v. *Arcade R. Co.,* 113 N. Y. 93.) Chief Judge Church, in *People ex rel. City of Rochester* v. *Briggs* (50 N. Y. 553, 558), said the object of this constitutional provision was to prevent the fraudulent insertion of provisions upon subjects *foreign* to that indicated in the title. "Nor should courts," he continued, "criticise too rigidly the details of a bill to find extraneous matter. Every presumption is in favor of the validity of legislative acts, and they are to be upheld unless there is a substantial depar-

ture from the organic law." In *Matter of Dept. of Public Parks* (86 N. Y. 437) it was said that the title need not be exact and precise in all respects, that it was sufficient if it conveys to the mind an indication of the subject to which it relates. (See, also, *Matter of Mayor of City of New York*, 99 N. Y. 569; *People ex rel. Olin* v. *Hennessy*, 206 N. Y. 33, 39; *Economic P. & C. Co.* v. *City of Buffalo*, 195 N. Y. 286; *People ex rel. Corscadden* v. *Howe*, 177 N. Y. 499.)

The above title could deceive no one. It directed attention to the grants, whatever they were, made by the act of 1873; in other words, the grants under the Vibbard (Newton) map, and established these in fee simple. If this act of 1884 attempted to strengthen the rights or privileges granted under the previous acts and to firmly fix them as fee grants, it did so by its main provisions and sufficiently indicated it in the title so as not to mislead or deceive anybody. The claimant herein, therefore, had a fee to the lands appropriated by the canal board and the referee was right in so finding.

*Third.* But if we treat the rights under the above acts as capable of forfeiture unless exercised or acted upon, then I say that the findings in this case justify the conclusion that these rights and privileges have been used and the lands filled in and occupied by the upland owners.

William Beard, the claimant's predecessor in title, owned the upland extending from Reid street on the west of the appropriated property to Bryant street on the east of it. It was all one large extent or piece of upland. By various acts of legislation, some of which have been mentioned, the upland owners were given the right to fill in. The larger part of this water front and land under water to the bulkhead line has been filled in and the Erie basin established. The portion taken by the state in this proceeding is a little less than one-eighth of the whole of the bulkhead line of the Beard property. The land surrounding that appropriated by the state has

been filled in by the claimant's predecessor in title up to a level with the surrounding country and the city grade of streets six or eight feet above mean high water. The filling also extends across the corner of the land appropriated outside of that which was formerly high land. Beard's property, land under water, has been filled in on either side of the portion here sought to be taken. The claimant's predecessor in title, after the act of 1875, also dredged within the limits of the Henry street basin created by that act and also constructed a pile pier across the outer boundary on substantially the bulkhead line established by the act and extending nearly across the lands appropriated by the state. A roadway was also constructed slightly to the west of where Columbia street would be, if said street had been opened as shown upon the maps of the city of Brooklyn and the city of New York. The lands appropriated have also been used by the upland owners for a dumping ground and they have derived a revenue therefrom by charging and collecting for the privilege of such dumping. This was a method of filling in. It has been stipulated that 82,655 square feet of the 1,442,022 square feet appropriated in this proceeding have been filled in by the owners of the upland pursuant to the rights granted under the acts of the legislature.

How can it be said that in view of these facts the privileges granted to Beard and others, the upland owners, by the legislature of this state have not been exercised and developed into rights of property?

For the above reasons, the determination of the Board of Claims was correct and the judgment of the Appellate Division affirming the same should be affirmed.

CHASE, COLLIN, HOGAN, CARDOZO and McLAUGHLIN, JJ., concur with HISCOCK, Ch. J.; CRANE, J., reads dissenting opinion.

Ordered accordingly.